May it please the Court, Armin Skolmowsky for Petitioner Budiono. I'm going to request five minutes rebuttal time in this case. You've got to keep track of your own time. Okay, Judge. Will do. Could I jump in with a question with you? Would you mind? Because it appears that the BIA and the IJ relied on the petitioner's admissions that the JMA was a violent organization, quote unquote, and that the JMA participated in riots in which people died in order to find that the JMA was a terrorist organization. What's your best authority that these inferences were improper? And I guess just my general sort of in what I'd like you to focus on, is there any rule that the BIA and the IJ must rely on direct evidence to find that a group is a terrorist organization, or can they rely on circumstantial evidence? It appears with this Tier 3 group that the judge focused on, it could just be two or more people that they believe are committing violence or terrorist acts. That's what the IJ basically, I think, hung his hat on. He felt that this group happens to be involved possibly in some kind of violent activity, maybe. We're not even sure. It's not clear. Well, the petitioner made certain statements about the activities and why he eventually, the riots and the deaths, but there wasn't, I don't think there was in the record that the people died by gunfire or explosives. Right, Judge. We went through a whole list of all the definition of terrorism and nothing applied. This group is nowhere to be found in the record. In 1998 riots that occurred in a city of 9 million people, a thousand people died. He said that, well, maybe somebody from my group might have been involved in this riot, but he couldn't even say if someone died, he said, well, maybe one person, maybe one person died. But the group itself never authorized anything to do with the riots. And I think what might come down to it is that, let's just say in this situation, what we were arguing too is that an entire organization doesn't become a terrorist organization because some members of a group might have committed some violence. And the IJ hung his hat on the fact that maybe somebody from this group did something during the riots. That's it. We think it's more of a question of authorization. Well, I guess I'm also too just sort of looking at the whole thing holistically and it seems that if the JMA is not a terrorist organization, what you're arguing, then that then becomes a tension with your argument that Budiano suffered persecution at the hands of the JMA. And it was found, they found past persecution in this case. But it was basically, he was found to be... Well, but the court found past persecution because it found that the JMA was a terrorist organization. But if you say it's not a terrorist organization, then isn't... No, actually, the IJ found that the JMA persecuted Budiano. But also found that the JMA was a terrorist organization. And that he gave material support to the JMA. Right. But if you pull that out and say the JMA is not a terrorist organization, which you're arguing, then why, then what about the past persecution suffered? I mean... Well, they were, the government, I mean, the IJ... So can you pick and choose which part you like of what the IJ said? Well, the IJ did find that there was past persecution. The government did not... But the underpinning of that was that the JMA was a terrorist organization. Right, persecuting Budiano, the petitioner. Because of his material support, and then when he pulled out, and he wouldn't do the fundraising for something, or... Well, we're saying he never even gave some material support. They're pointing to two issues. One is the fundraising, one is the passing out of flyers. He never fundraised. He was appointed to be a fundraiser. And once they said to him, look, you need to fundraise for this mosque, and you need to get these donations by all means necessary, he said, I can't do that, and he quit. Well, he was in it for, what, 10 years, I think? But no, but he was appointed... No, I know, 10 years, and he said he was productive, I guess. But no, he joined in 1990. Initially, it was just a community organization to help the poor. They taught the kids certain things, fed them, whatever. In 1998, things started to get a little bit dicier. There were some fanatical elements that came in, but it wasn't the group's purpose. But in 2000, when they said to him, look, you're going to be a fundraiser, and you need to do this violently, he basically quit. He stopped at that point. That's when he discovered that there is this violent element, and then he left. And because of that, he was accused of being an apostate, and he was then persecuted by these members. So he never did any fundraising, and he never passed out flyers. And there's enough points in the record that point to that. So he never even gave some material support. The people that were killed in 1998, what does the record reflect? Were they non-Muslims? Well, the 1998 riots, I mean, they start off as a student demonstration, which turned into an ethnic riot, and it ended up in the Chinatown area of Jakarta. But it was mainly a political issue that turned ethnic, and I think the Sayal case discussed it that briefly in the Ninth Circuit. But it became a thing where some Muslims attacked non-Muslims, and many Chinese were attacked, because they are non-Muslims. So these cases are more prevalent than something like this. So the IJ, of course, must have just focused on that issue and just pinned the hat on the whole organization as well as the respondent, as our petitioner, that he was a terrorist or a terrorist group. And otherwise, there's nothing much in the record about what happened in 1998, just the fact that the judge asked him, you know, did someone die? Yes. And he basically at first said it was the action of radical Islamists that were responsible. And on remand, he makes that clear, actually. But there was one question that the IJ asked where it was kind of vague, and he said, well, one person might have died. You know the exact number? I don't know. And that's why the government says more than two died. Well, thousands died that day. And there's nothing in the record that says that JMA was even there. I mean, there's some other groups that are always listed in the record. But this is like a little community organization, local organization he was involved in. And, you know, he had no knowledge that this was a violent organization. It's only later on, you know, when he was told, you know, you must be the fundraiser. You're the fundraiser. You must do it. So if you have to, violently, he said, I'm quitting. So, you know, A, you know, we think that it's not a terrorist organization. But secondly, he never gave mutual support. Well, if it's any, it has to be Tier 3, right? Everyone agrees it's not Tier 1 or Tier 2. Right, Tier 1 is where they listed in the State Department. Tier 2 is like a secondary thing. But yeah, it's agreed that they're saying it's Tier 3. The IJ is saying that. The EIA is saying, you know. And the standard of review is whether a different result is compelled here. Right. Okay. And, you know, in our opinion, you know, this situation, even if. . . It got remanded too, right? This wasn't just one rodeo, right? Right. We went back for clarification. And once it got clarified, which I thought a lot of issues were clarified, he was accused of trying to diminish things, which was not the case. He just was explaining things, because in the first hearing, it was pretty simple vague questions that were coming out from both sides, at least from the judge's side, regarding this 1998 event. But, you know, like I said, even if it were to be found that this was a Tier 3 group, you know, he had no knowledge of this violence, you know, because, like I said, he can't be held responsible for random people in your group committing violence. And he doesn't even know what happened. He says, well, maybe. I'm not sure. Yes. One person might have been killed. We might have been involved. For sure the Islamists were involved. Well, was your group involved? Yeah, I think so. But, you know, it's very unclear. And, you know, he did become aware of everything in 2000, and he quit. So, in this situation... And then when did he come here? Well, he fled because of that situation. He was beaten up by the group, and then they came to his house three days later. He came in 2000, July 11th, on a non-immigrant visa. He overstayed, right? He applied for asylum, I think, three years later. He had discovered that one of his friends who refused to join a Muslim group was later killed for failing to do so, and that he was afraid to go back for that reason. Also, he claims that the group is still looking for him in Indonesia, if he were to return there. So there's well-founded fear on that issue, too. So there was two issues. One is, you know, he's afraid to go back because they're going to... the GMA will go after him. And the other one was that his friend was killed because he refused to join a Muslim terrorist organization, fighting group. And outside of that, I mean, we would... You know, our position is that, well, we know he's already been found to have passed persecution. The government did not rebut the presumed future persecution, so we had that already in the bag. We're saying that, you know, he's not a member of a terrorist group. He's not a terrorist group. He did not provide material support. So he should be remanded for, at the very least, withholding. We're also arguing Kat, and we're also arguing the one-year issue. With Kat, I mean, we feel that he was tortured, basically, by the police. The police were working in collusion with GMA after GMA tried to... After he quit from the fundraising group, GMA came to his house and demanded some money. And then they came back later, and then they molested the wife and beat him up. He went to the police to complain. The police didn't do anything. Later on, about two months later, the police arrest him based on collusion with GMA. And the police basically beat a confession out of him. And then the wife ends up paying, I think, a two-month salary to get him out. So we believe that is a level of torture, too. So we would ask that he be found, that the court finds that he was tortured, and he was not a member of a Tier 3 group, and that even if he were a member, he did not offer material support in this case. I want to save a little time. Sure, Judge. Thank you. Is that your father over there? Yes. Looks just like you. Really? He likes hanging out here. He even parts your hair the same way. Well, you're a good dad, and he's a good son, because I would never let my parents come to court and watch. So that's a... Good morning, Your Honors, and may it please the Court. Daniel Smulo on behalf of the United States Attorney General. This is a fairly straightforward case of an admitted visa overstay who has failed to prove his eligibility for the relief that he's seeking. Now, is there any that, you know, the first time the government, I think, the IJ said, hey, I thought you could have done a better job of, you know, telling me more about this JMA and whatever's going on. And then the second time, if I look at the determination, do we have to have evidence that the JMA used weapons or other destructive devices to be a Tier 3 terrorist? Your Honor, I'm going to answer your question, and I hope you'll indulge me if I explain a little bit about the law. Yeah, no, I would be, you know, and how from this evidence that you can get there. Okay, thank you, Your Honor. Again, this is a petitioner who is seeking relief. He's admitted to visa overstay. Under the Immigration and Nationality Act, it is his burden to prove his eligibility for the relief that he's seeking. In this instance, I'll focus specifically on the withholding of removal. Okay? Now, it is his burden, and under the applicable regulations, it's 1208.16d2 for withholding of removal, and there are corollary provisions for asylum and even for, you know, general applications for relief, where the evidence indicates the applicability of a bar to relief, and an issue here is the material support bar. It is also the petitioner's burden, the alien's burden, to prove by preponderance of the evidence that the bar does not apply. Am I being clear so far? Well, so, yeah, you're going on the burden of proof, whereas I'm saying that if he had the burden of proof, then you're saying, like, that was his, he had to present that. Material support has to be of a terrorist organization, right? That's correct. What's the evidence of that, of a terrorist organization? The evidence indicates from the petitioner himself during his first testimony, and this is pages 545 to 547, that it is a terrorist organization, as he described it. It is a fundamentalist Muslim organization that lashed out against the government, that demonstrated against the government. Tell me, what subsection of the statute are you referring to when you say this defines a terrorist organization? It's a Tier 3 organization. It is 1182, this is Title 8. 1182. 1182, A, 3, B. A, 3, B. A, 3, B, Romanette 6. Wait a minute. I apologize. B, Roman 6, okay. Romanette 6, and then within that subsection 3, a group of two or more individuals, whether organized or not, that engages in terrorist activity. The evidence here indicates that, in fact, the evidence is rather plain, that this was an organization that at one time was peaceful, but in 1998 became radical, violent against the government, and murdered people in the course of its violent demonstrations. You have to show one of six enumerated, and involves one of six enumerated activities, including the use of any explosive, firearm, or other weapon, or dangerous device with intent to endanger directly or indirectly the safety of one or more individuals or to cause substantial damage to property or a threat, attempt, or conspiracy to do the foregoing. Yes, Your Honor. What evidence do we have of explosives, firearms, weapons, dangerous devices? There is no direct evidence of any specific weapon that was used  However, the evidence indicates and raised the inference by his testimony that such weapons were used. It's inferential that during the riots they used some type of weapon, unless under some theory they may have strangled people during the riots, but inferentially at least, and this is why I began with a quick description of the law and the applicable burdens of proof, all of which are on the applicant. The evidence raised the inference that they used a weapon in the course of these murders, and he failed to disprove that by a preponderance of the evidence, and for that reason... Okay, the inference is from his own testimony, isn't it? That's correct. All right, now what can you point to in the testimony from which you infer that? From which to infer what precisely they did. When I say inference, you know, inference that a weapon was used. The fact that multiple deaths resulted during the... Where in the transcript did he testify to that? Pages 545 to 547, specifically, and on page 547, Your Honor, question, were these... Just a minute, let me find it, 547? Yes, Your Honor. Okay, go ahead. Question, were they the cause of these riots, and ultimately in certain areas people died because of your group? Answer, yes. Continuing to line 14 on page 547. Question, more than one, sir? Answer, yes. That was line what? I begin line 3 with a questioning. Yeah, but you went to what line after that? Excuse me, Judge, line 14. 14, okay. More than one, sir? Answer, yes. Okay, and he found out that his group had killed people in 1998. Again, that's on page 547. Page 546, the immediately preceding page, he describes specifically the actions of his organization. As of 1998, again, 546 line 6 to line 7, they start to recruit people to become fanatic, to become more fanatic. Line 13, they always do demonstration to the government policy. And then line 17 through 19, since 1998, they make a lot of rioting and rioting, and the result is society became afraid toward them. By any inference, this is a terrorist organization under the Immigration and Nationality Act, and Mr. Budiono in his subsequent hearings, he failed to disprove that by preponderance of the evidence, as the law requires. Okay, well, okay, so the other side. So when you do a bar, okay, you say there's a bar because of this. What you're saying is you don't have to prove it's tier 3, you're just saying that's a bar. He has to rebut that by the preponderance of the evidence? Yes, the burden is always on the applicant for relief. All you have to do is claim bar. And so then what he should have done is what you're saying, if he could show that those riots say perhaps that everyone was strangled or if everyone was beat up. For example, yes. And the court were convinced of that, then he would have met his burden. Ostensibly, he would have met his burden with respect to the tier 3 organization. Yes, I think that's correct. So you're saying that the government has no burden to show that these deaths were by shooting, by bombs, or, you know, whatever's listed, that you just have to kind of throw it out there. Your Honor, essentially, yes. I'm not sure I politely disagree with your conversation. It's throw it out there. What is the evidence? If you wanted, could you have, I mean, obviously it makes it a lot easier if there's more in the record. I mean, you wouldn't be prevented from putting more in the record if you chose to, right? But you could still say, hey, it's not my burden, but I'm going to show, you know, but since he's like saying, now, by his own testimony, he gets out in 2000? Yes, Your Honor. Okay, and the riots were in 1998? Yes, correct. Okay, but I think what he's claiming is that, okay, but when he was asked to go and fundraise and whether they were Muslim or non-Muslims, you get money for this mosque by any means possible. Yes. That he said was in 2000, and that's when he got out? He said that during his second round of testimony, post remand testimony, and the immigration judge discredited that because suddenly the JMA went from this violent organization that not only persecuted him and murdered others, but to, well, a couple of people who happened to be members did some violent activities. Did the IJ make any factual findings that are binding on this court? The IJ found that he fundraised, and that's supported in the record at page 545. Is that what you rely on for the material support? Yes. Page 545? 545, question beginning line three, so you did fundraising, is that right? Line number four, answer, yes. Line 15, when did you start your activities as a fundraiser for this organization? Line 17, answer, in 2000. So he admits doing some fundraising during his initial round. Later, after he has the knowledge that this is creating a significant legal hurdle for him with respect to his application for relief, he says, well, you know what? I quit before they actually made me do it, and it's a little, that was discredited. Does the IJ specifically say that anywhere? Or is it, does the IJ say, hey, I don't really believe you, that you. He does, Your Honor. Where's that? That's in his second decision, and I apologize. I don't have the page number in front of me. It's in the second IJ's decision, and the board notes that testimony and affirms, finds no clear error in finding that. It's my recollection. Okay, I think I have it here. Well, I think the problem, maybe I read it differently, but my problem with the IJ's decision is it's pretty vague and gruesome. He doesn't make any specific findings. Your Honor, wait, wait, wait. If you look at the next to the last page of the IJ's order, which is 104 of the record, it's where he kind of sums it up. It says, you know, with knowledge that certain members of the group were violently acting, respond and remain active. What does that mean? But I want to get back to this burden of proof issue, though. You say the proof is always in the withholding context, right? It's in the asylum context, in the withholding context, and also in the general applications for relief context. When you say the proof is on the applicant, at what stage? In other words, the government makes some kind of prima facie showing that the bar applies, or does the government even have to do that much? The government need not do that, Your Honor. The burden of proof. Well, I mean, does the applicant have to rebut every possible bar to withholding, even though there's nothing in the record to show that there might be a bar? No, Your Honor. The regulations are fairly straightforward that if the evidence indicates the applicability of the bar, then the applicant must also prove by preponderance of the evidence that the bar does not apply. Doesn't that mean that the government then has to come forward with the evidence to show, right, as you say, the applicability of a bar? Your Honor, no. The answer is this is immigration and administrative law. It's a little bit different from the criminal, certainly, and the civil construct that the court is unlikely to be more commonly applying. This is a unique, at least to my knowledge, area of the law, in terms of immigration, where there is no burden shift here with respect to the applicability of bars to immigration relief. It is always, once again, this is an alien. Who's supposed to know all this? I'm sorry, Your Honor? The alien is supposed to know what these bars are and then knock them down. Only where the evidence indicates, Your Honor, and it's not on the alien. It's certainly something that's discussed in the course of an immigration hearing as it was here. It's wait a minute. Suddenly this is a violent group, et cetera, and the evidence will speak for itself. But, yes, that is correct. Where the evidence indicates the applicability of a bar, the alien must also prove by preponderance of the evidence that the bar does not apply. So the alien need not attack straw men, so to speak. This bar may apply, this bar may apply, et cetera. It's only where the evidence indicates. And once the evidence indicates, the alien is, of course, on notice under the law that the alien also bears the burden to prove by preponderance that the bar, in fact, does not apply. Who tells the alien then, after evidence comes in, well, now you've got a bar. Now you've got to satisfy your burden. Well, in this instance, he was represented by very able counsel, and certainly the immigration judge brought it up as well. So there are two ways that the alien is on notice. Is that what happened here? My read of the record, particularly with the remand, yes, Your Honor, absolutely. That's what happened here. Most of the questioning about this, you know, the possible application of this bar, most of the questioning seems to have been developed by the IJ, right? Not by either counsel. I don't quite recall who did the questioning. I didn't think so, Your Honor, but my command of who was asking those questions is, I apologize, I'm not quite certain. Anyway, your position is that the government has no, technically has no burden. Yes. But if some way in the record it appears, right, that a bar might apply, then the petitioner, the applicant, has a burden to knock down that bar, right? By a preponderance of the evidence, yes, Your Honor. Again, this is, in this particular situation and in all cases, this is somebody who is seeking government largesse. This is somebody who has already either been found to or in this case conceded the removability. So now the petitioner or the applicant is seeking largesse or some type of relief or in the context of withholding of removal, a protection, form of protection. It is at that point that it becomes the alien's burden. So I want to make that, draw that distinction as well. So as opposed to where the state decides they're going to charge you with a crime and that you, that the state then has the burden beyond a reasonable doubt to put that evidence on and the defendant doesn't have to do anything. Precisely. And even in the immigration context, Your Honor, as in Mr. Budiono's case, having been admitted lawfully, it was the government's burden to prove by clearing convincing evidence that he had overstayed his visa in this case, which they did through his concession. So yes, Your Honor, that's precisely the point. So if I were to summarize your argument that you would say that the burden of proof is the way for the court to look at it and under the burden of proof that the petitioner did not show by preponderance of the evidence that he was entitled to relief from the bar and that the standard of review being whether the evidence compels a different result that it does not based on if you apply those two burden of proofs, am I summarizing your argument? You're summarizing it perfectly. I thank you, Your Honor. That's just the government's position in this case. Okay. And I'd like to note the substantial evidence standard. I thank you for doing so. Okay. Thank you. There are no further questions. Well, just looking at the transcript here, page 000130, the judge says to Mariano, Sir, has the JMA ever used explosives or firearms? To your knowledge, no, never. Then you ask the question, to your knowledge, has JMA ever caused substantial damage to property? No. All the things that we talked about, to your knowledge, did JMA ever threaten to do so? No. Or attempt to do so? No. Or conspire to do so? No. These questions bring the definition of terrorism. Your Honor, the immigration judge found that during the second round of hearings, which you're reciting and quoting from, the extent to minimize JMA conduct was not worthy of belief. Overall, he was credible, but as to that aspect of his testimony, he found that not credible, Your Honor. Overall, he was credible, but not to that aspect. Not with respect to his subsequent minimization, Your Honor. If there are no further questions, I'd submit on the brief and ask the Court to deny the petition for review. Thank you, Your Honors. Mr. Kowalski, I want you to direct yourself to two issues, and before you argue whatever else you want to argue, but one, the government's position is, even though there's no direct evidence, there's lots of indirect evidence. First, inferences can be drawn of terrorist activity, namely that weapons were used in these riots by members of the JMA. Second, he points to the pages in the transcript which show that your client gave material support in the way of fundraising to the terrorist organization. What's your response to both of those contentions? I think he's wrong. If you look at most of the transcript, it's very clear that he was appointed to be a fundraiser. They told him what to do. He found out, and he quit. He didn't do any fundraising whatsoever. He didn't pass out any flyers. If you go back to page 554, it says, what month or year was that, 98? That's what I'm asking you. In May. All right. And you wrote that you were active in this group. Is that right? That's right. So you did fundraising. Is that right? Yes. Pass out flyers. When the flyers went out for fundraising, What page are you on? 545. Okay, go ahead. 544 or 545. So he did fundraising. Is that right? Yes. It's true. He was appointed a fundraiser, but he quit. I mean, soon thereafter, he didn't do any fundraising. Pass out flyers. When the flyers went out for fundraising, I backed myself. Wait a minute. Right on 545, line 15, the question is, yes, when did you start your activities as a fundraiser? And his answer is in 2000. In 2000, right. But, I mean, he immediately quit. What do you mean he quit? When he was told that you have to But there's no requirement of a definite term. Well, he was appointed, and he didn't do it. Even his statement, go to page 761. This is his additional statement. The club leaders appointed me to lead a group of Muslims to collect donations from community residents. We were told to use whatever force necessary, sorry, we were told to use whatever means necessary, including force, to get money from people. I therefore requested to withdraw. He never did it. That's his original statement. Do we have to, all right, but that's what he, we're going through everything that he says. The government said that, the IJ said, okay, I believe you're minimizing. I don't believe everything that you're saying in taking the context of when he said what and when he sort of pulled away from it. Did that happen in the record? Well, I mean, on remand, on page 132, it's asked, and how long were you a fundraiser for this group, JMA? I have never served as a fundraiser because I rejected the position. It states that. But he said something different the first time, right? Well, he was appointed. In his mind, he was appointed as a fundraiser. So I'm a fundraiser. I am a fundraiser. Okay, do you, is there anything about what the government says about the burden, how the burden of proof and all of that, is there anything that you disagree with about that? Well, I think he's, you know, all the questions were, I mean, of course they're going to say, you know, once it got remanded and he had a chance to elaborate, now it's all considered to be lying. So, I mean, he's saying that he did not rebut anything, but he did. We went through the entire terrorist statute. What's he going to say? Did you strangle someone? No, I guess what I'm saying is, did the government correctly state the burdens of proof? Now, how all of this fits in, I know that you're disagreeing with it, but did the government correctly state that it's your client's burden by a preponderance of evidence to show, as opposed to the government's burden by a preponderance of evidence to prove? I believe that that might be correct, that burden. Okay. But, you know, our position is that it hasn't, it shouldn't have gone that far. I mean, he's rebutted everything. If there is something that needs to be rebutted, and he's basically explained everything away as well. Yeah, but the IJ, as counsel said, the IJ didn't buy his, what he calls, minimization testimony wholesale, did he? So it's IJ's province, you know, to make credibility determination. I understand, but I think, you know, basically out of the 250 pages of transcripts, they rely on one page where it's very vague, and when asked to explain, they say he's not telling the truth. I mean, he never passed out flyers. I mean, even this is pretty clear on the original page, and they said he did, but he didn't. You know, he backed out of it. He never passed out flyers, never fundraised, and they're using that as material support. You know, and it's just factually incorrect, and we've been trying to discuss this since the BIA and even in this court that it's factually incorrect. He's not a fundraiser, didn't pass out flyers, did not give material support to the group. Anyway, thank you all. Thank you. Thank you, Judge. We'll read all that over once more. All right, thank you very much, and we'll adjourn until tomorrow morning.
judges: Pregerson, Tashima, Callahan